# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF NEW YORK

№ 15-CV-5774 (JFB)

RICHARD SAVAGE,

Plaintiff,

VERSUS

CAROLYN W. COLVIN, ACTING COMMISSIONER,
SOCIAL SECURITY ADMINISTRATION

Defendant.

**MEMORANDUM AND ORDER**
February 28, 2017

JOSEPH F. BIANCO, District Judge:

Plaintiff, Richard Savage ("plaintiff"), commenced this action pursuant to 42 U.S.C. § 405(g) of the Social Security Act ("SSA"), challenging the final decision of the Commissioner of Social Security ("Commissioner") denying plaintiff's application for disability insurance benefits. An Administrative Law Judge ("ALJ") found that plaintiff had the residual functional capacity to perform some light work, specifically work as a limousine driver, hotel desk clerk, hand packer, or ticket taker. Therefore, the ALJ concluded that plaintiff was not disabled. The Appeals Council denied plaintiff's request for review.

Plaintiff now moves for judgment on the pleadings pursuant to Federal Rule of Civil Procedure 12(c). The Commissioner opposes plaintiff's motion and cross-moves for judgment on the pleadings. For the reasons set forth below, the Court denies the Commissioner's motion for judgment on the pleadings, denies plaintiff's motion for judgment on the pleadings, and remands the case for further proceedings consistent with this opinion.

I. BACKGROUND

A. Facts

The following summary of the relevant facts is based on the Administrative Record ("AR") developed by the ALJ. (ECF No. 9.)

1. Personal and Work History

Born in 1966, plaintiff completed college in 1990 and began work as a police officer shortly thereafter, serving in that position until 2010. (AR at 191, 207.) Plaintiff injured his left shoulder in 1999. (*Id.* at 284.) In May 2008, he reinjured that shoulder, as well as

his right shoulder, while apprehending a suspect. (*Id.* at 71, 284.) He underwent reconstructive surgery on his right shoulder in May 2009 and returned to work on restricted duty, which plaintiff characterized as a "desk job" that required him to perform paperwork, use a computer, and answer a telephone. (*Id.* at 72.) He retired on October 31, 2010. (*Id.*) Afterwards, he applied for and received a disability pension. (*Id.* at 73.) He declined a security job at Macy's and did not actively seek work following his retirement, citing pain in his back rather than pain in his shoulder. (*Id.* at 79–81, 93.)

Plaintiff sought Social Security Disability benefits on June 26, 2012, complaining of shoulder pain beginning in 2008 and lower back pain beginning in 2005. (*Id.* at 191.) He initially alleged an onset date of October 31, 2010, the day he retired, but later revised the onset date to February 27, 2012 to correspond with the onset of his lower back pain. (*Id.* at 106–08, 206.) He described the pain overall as an ache in both shoulders, a stabbing and aching pain in his lower back, and occasional spurts of pain shooting down his legs from his back. (*Id.* at 82, 220–21.) Plaintiff indicated that he experienced this pain every day and that prolonged sitting or standing would trigger his back pain. (*Id.* at 83, 221–22.) About once a week, he would sporadically experience back pain so severe he could not leave his bed except to use the restroom. (*Id.* at 84–85.) He also stated that his right arm had lost mobility, and he could not raise it above eye level. (*Id.* at 89.) His right shoulder would not cause him pain while at rest, but he indicated that "any type of motion," such as walking, would trigger at least "a little bit of shoulder pain." (*Id.* at 91.)

Plaintiff reported that he could stand for up to ten minutes before needing to change positions, could not walk without interruption, and could sit for ten to fifteen minutes before feeling pain that required him to get up and stretch. (*Id.* at 94, 217–18.) Reaching caused "sharp pain." (*Id.* at 218.) He also indicated that he was "very cautious about lifting anything" and would "not attempt to lift anything heavier than 10 lbs." (*Id.* at 217.) He could climb stairs when necessary, occasionally kneel, and occasionally squat. (*Id.* at 218.) Plaintiff could follow spoken and written instructions, and he had no problem with stress, paying attention, or remembering things. (*Id.* at 219–20.)

Because of his back pain, plaintiff would constantly need to change positions at night and thus had trouble sleeping. (*Id.* at 108, 213.) During a typical day, he reported that he would read, watch television, and drive his kids to different locations. (*Id.* at 104–05, 213.) Plaintiff initially indicated that he could "do basic chores such as ironing [and] mowing [the] lawn" but avoided yard work. (*Id.* at 101, 215.) Later, he stated that he avoids household chores and his wife vacuumed, did the laundry, mowed the lawn, and used the snow blower. (*Id.* at 101–02, 109.) He also initially indicated he would attend his kids' sports games "most of the time" (*id.* at 217), at one point riding as a passenger in a car for three hours to his son's lacrosse tournament (*id.* at 97). He also drove himself to the hearing before the ALJ, a 50-minute drive each way. (*Id.* at 96–97.) Later, he stated he would only attend local sporting events "once in a while," maybe five games a year or 20% of the time. (*Id.* at 99–100.) He also said that he struggles to sit through movies at the movie theatre and does not go out with his wife very often. (*Id.* at 100–01.) With his right arm, plaintiff could shave, brush his teeth, open a door with a key, put on a seatbelt, write, pick up change, push a grocery cart, and lift up to ten pounds. (*Id.* at 92–93.) When his back pain was not too severe, he could dress himself, cook, barbeque, and drive a car. (*Id.* at 96.)

## 2. Medical History

On May 2, 2008, following his encounter with the suspect where he injured his shoulders, plaintiff saw Dr. Salvatore J. Corso ("Dr. Corso" or the "treating physician"), an orthopedic surgeon. (*Id.* at 284–86.) Examination of the right shoulder revealed forward elevation to 165 degrees and abduction to 150 degrees. (*Id.* at 285.) External rotation was performed to 65 degrees and internal rotation to T8. (*Id.*) Rotator cuff strength was mildly decreased. (*Id.*) There was no sign of instability on stress testing. (*Id.*) The apprehension, Neer, Hawkins, and cross-body abduction tests were positive. (*Id.*) Examination of the left shoulder revealed forward elevation to 160 degrees and abduction to 150 degrees. (*Id.*) External rotation was performed to 60 degrees and internal rotation to T7. (*Id.*) Rotator cuff strength was normal. (*Id.*) There was anterior instability of the shoulder joint. (*Id.*) The Speed's test, Yergason's test, and O'Brien's test were positive. (*Id.*) Neurological testing revealed normal sensation and motor strength findings. (*Id.*)

Dr. Corso made the following diagnoses in the right shoulder: bicipital tendonitis, subacromial impingement syndrome, and ruled out rotator cuff tear. (*Id.*) In the left shoulder, he diagnosed a possible labral tear with recurrent anterior and glumohumeral instability. (*Id.* at 286.) He recommended rest, icing the joints, elevating the injured extremity, and physical therapy. (*Id.*) Dr. Corso also ordered an MRI and recommended nonsteroidal, anti-inflammatory medications for pain. (*Id.*)

A report of an MRI signed on May 15, 2008 showed no evidence of a rotator cuff tear, but there were findings of mild osteoarthritis of the AC joints with no impingement and an irregularity of the anterior superior glenoid labrum suggesting the possibility of a tear. (*Id.* at 282.) Because there was no joint effusion, it was "difficult to confirm this tear." (*Id.*) A report of an MRI signed on May 19, 2008 revealed moderate acromioclavicular degenerative arthropathy and heterogeneous tendons in the rotator cuff suggesting calcific tendonitis. (*Id.* at 283.)

Plaintiff returned to Dr. Corso on May 30, 2008, and examination produced results similar to the May 2 examination. (*Id.* at 280.) Dr. Corso also reviewed the MRI results and diagnosed an anterior labral tear in the right shoulder and calcific tendonitis in the left. (*Id.* at 280, 281.) He prescribed physical therapy and sought authorization to perform arthroscopic shoulder repair with two opus anchors. (*Id.* at 281.)

On March 11, 2009, plaintiff had a follow-up visit with Dr. Corso. (*Id.* at 278.) Examination results were consistent with past results, and an anterior labral tear was diagnosed in the right shoulder with MRI evidence. (*Id.* at 278–79.) Dr. Corso discussed treatment options with plaintiff and noted that plaintiff, having failed a lengthy trial of non-operative treatments, wished to proceed with surgery. (*Id.* at 279.) Dr. Corso performed arthroscopic reconstructive surgery on plaintiff's right shoulder on May 22, 2009. (*Id.* at 273.)

Plaintiff returned to Dr. Corso on June 3, 2009, complaining of right shoulder pain. (*Id.* at 271.) Examination showed no gross signs of neurovascular defects and no muscle atrophy or asymmetry. (*Id.*) Plaintiff's surgery scars had healed, and Dr. Corso removed the sutures. (*Id.*) He instructed plaintiff to rest his shoulder, discussed the entire range of possible treatments, and recommended medication and a physical therapy evaluation. (*Id.*)

Additional follow-up visits occurred on July 31, 2009, January 6, 2010, and March 31, 2010 where Dr. Corso made findings and

recommended treatment consistent with earlier visits. (*Id.* at 263–70.) On July 31, 2009, he advised plaintiff to rest his right arm, avoid activity that aggravated his pain, take medication, and undergo physical and occupational therapy. (*Id.* at 269.) He also prescribed Oxycodone. (*Id.*) On January 6, 2010, examination revealed no muscle atrophy or asymmetry, forward elevation limited to 145 degrees and abduction limited to 120 degrees, and mildly decreased rotator cuff strength. (*Id.* at 267.) Dr. Corso recommended icing or heating the shoulder joint, advised plaintiff to avoid athletic activities, and prescribed Percocet. (*Id.*) On March 31, 2010, Dr. Corso noted tenderness over the A-C joint and proximal humerus, pain with resisted shoulder motion, no instability on stress testing, and positive apprehension, Neer, and Hawkins tests. (*Id.* at 265.) Dr. Corso made the same recommendations as he did on January 6, 2010. (*Id.* at 266.) He also noted that plaintiff was "disabled from ability to do the duties of a police officer." (*Id.*)

On April 28, 2010, Dr. Corso wrote a letter recounting plaintiff's medical history and treatment up to that point and indicating that plaintiff had "not made significant progress over the last two to three months" and also had "a significant disability especially in his line of work." (*Id.* at 264.) Plaintiff "would be at increased risk using a firearm with the right shoulder," Dr. Corso continued, "since his range of motion is limited and his pain persists." (*Id.*) Dr. Corso concluded that plaintiff was "disabled from his line of work and [could] only do restrictive duty." (*Id.*) Finally, "his prognosis for full duty return as a police officer [was] poor." (*Id.*)

On June 17, 2011, plaintiff visited Dr. Corso for the final time before his onset date in February 2012. (*Id.* at 260–62.) Plaintiff reported discomfort in his right shoulder that swimming seemed to alleviate. (*Id.* at 261.) Examination again revealed tenderness over the right A-C joint and proximal humerus, pain with resisted shoulder motion, no instability, muscle atrophy, or tenderness, and positive apprehension, Neer, and Hawkins tests. (*Id.*) Dr. Corso performed a subacromial corticosteroid injection into the right shoulder. (*Id.* at 262.)

On February 29, 2012, plaintiff visited Dr. Corso for the first time after his onset date, complaining of back pain. (*Id.* at 257–59.) Examination of the shoulders revealed results consistent with past examinations. (*Id.* at 258.) Examination of the lumbar spine showed normal alignment, decreased range of motion through the lumbar spine due to pain and stiffness, forward flexion to 60 degrees, extension to 10 degrees, and rotation to 20 degrees bilaterally. (*Id.*) Dr. Corso found no gross neurologic impairment or lateralizing signs. (*Id.*) There was lumbar tenderness present diffusely at the left gluteal region and muscle spasms in the left lumbar muscles, but no swelling. (*Id.*) FABRE test was positive in the left lumbar region. (*Id.*) Straight leg raise testing was positive on the left side, but under "neurological examination," Dr. Corso indicated that "straight leg test is negative." (*Id.*) His diagnostic impression for the lumbar spine was lumbosacral radiculitis, and he ordered an MRI. (*Id.* at 259.)

An MRI of the lumbar spine performed on March 3, 2012 revealed diffuse degenerative disc disease with multilevel bulging and facet arthropathy and central herniation L4-L5, with no significant mass effect on the thecal sac. (*Id.* at 256.)

Plaintiff met with Dr. Corso again on March 7 and May 10, 2012. (*Id.* at 249, 252.) At the March visit, plaintiff reported problems sitting and standing for extended periods and radiation of pain from his back into his legs. (*Id.* at 252.) In May, he also reported persistent lower back pain and numb-

ness in his left foot. (*Id.* at 249.) Examination results for the shoulders and back during both visits were consistent with the February 29 results. (*Id.* at 250, 253.) Dr. Corso's May diagnostic impression of the lumbar spine was lumbosacral spondylosis without myelopathy, and he recommended medication, periodic rest, icing, and elevation. (*Id.* at 250.) He also stated that plaintiff was unable to work and prescribed physical therapy two to three times per week over four weeks. (*Id.*) On June 6, 2012, Dr. Corso completed a medical assessment of ability to do work-related activities, discussed in detail below. (*Id.* at 309–11.)

After filing an application for Social Security Disability benefits in June 2012, plaintiff visited Dr. Andrea Pollack for a consultative examination on October 22, 2012. (*Id.* at 287.) Plaintiff reported lower back pain since 2005, describing it as constant, radiating into his legs, and greater on the right side. (*Id.*) Dr. Pollack noted his diagnosis of bulging discs and herniated discs, and treatment of physical therapy, but no injections or surgery. (*Id.*) Plaintiff also reported right shoulder pain since May 2008 due to a work-related injury that "comes and goes" but was made "worse with movement such as reaching." (*Id.*) Dr. Pollack noted his surgery, physical therapy, and injections resulting from a labral tear. (*Id.*) She also noted that he cooked twice a week, shopped once a week, provided childcare twice a week, showered and dressed himself independently, watched television, listened to the radio, and read. (*Id.*)

On examination, Dr. Pollack noted that plaintiff was "in no acute distress," had a normal gait, could walk on his heels and toes without difficulty, could squat three quarters of the way down, used no assistive devices, needed no help changing clothes or getting on and off the examination table, and could rise from his chair without difficulty. (*Id.* at 288.) There were full ranges of motion in the cervical spine and no abnormalities in the thoracic spine. (*Id.*) Lumber spine range of motion was flexion to 40 degrees; lateral flexion to 15 degrees; and rotation to 15 degrees. (*Id.*) Straight leg raising was negative bilaterally. (*Id.*) Range of motion in the right shoulder was forward elevation/abduction to 120 degrees, and external rotation to 70 degrees. (*Id.*) He had full ranges of motion in the left shoulder, and both elbows, forearms, wrists, hips, knees, and ankles. (*Id.* at 288–89.) Strength was full (5/5) and deep tendon reflexes were physiologic and equal in the upper and lower extremities. (*Id.* at 289.) There were no sensory deficits. (*Id.*) Hand and finger dexterity were intact; grip strength was full (5/5) in both hands. (*Id.*) Lumbar spine x-rays showed an asymmetric transitional L5 vertebral body, but was otherwise unremarkable. (*Id.* at 292.) Right shoulder x-rays showed status post-surgery. (*Id.* at 291.)

Plaintiff returned to Dr. Corso on January 31, 2013, complaining of numbness and tingling, persistent lower back pain, and problems sitting or standing for any length of time. (*Id.* at 313.) Examination results were similar to the results from Dr. Corso's February 29, March 7, and May 10, 2012 examinations. (*Id.* at 314.) His diagnoses were unchanged from the May 10 examination. (*Id.* at 315.) He prescribed physical therapy two to three times per week for six weeks, a brace and a splint, and Percocet for pain. (*Id.* at 315.) Dr. Corso indicated that plaintiff had a chronic disability and was unable to work. (*Id.*)

Plaintiff received another consultative examination on February 5, 2013 in connection with his disability application. (*Id.* at 302.) Dr. Craig Billinghurst noted a bilateral shoulder injury, labral tear with surgery on the right shoulder, continuous right shoulder pain, tenderness over the proximal humerus, pain with range of movement, no instability,

positive impingement sign, mild rotator cuff strength, and no atrophy. (*Id.*) He further noted that the left shoulder examination was normal, but range of motion in the back was decreased due to pain, a positive straight leg raising test on the left side, diffuse tenderness at the left gluteal region, and muscle spasms. (*Id.*) He reported that an MRI showed degenerative disc disease with multilevel bulging and facet arthropathy but no stenosis. (*Id.*)

Plaintiff visited Dr. Corso on March 27, 2013, complaining of chronic neck and lower back pain, which at times was severe (*id.* at 316), and again on July 10, 2013, reporting persistent lower back pain, numbness, and problems sitting or standing for any length of time (*id.* at 319). During both visits, the examination results, diagnosis, and treatment remained substantially the same as previous visits. (*Id.* at 317, 320–21.)

3. Opinions of Physicians

In his June 6, 2012 medical assessment of ability to do work-related activities, Dr. Corso opined that plaintiff could lift up to ten pounds only occasionally (defined as "from very little up to 1/3 of an 8-hour day") because of "multiple bulging discs" in the lumbar spine that caused him pain and spasm. (*Id.* at 309.) He also cited pain and weakness in the right upper extremity due to plaintiff's right shoulder rotator cuff tear surgery. (*Id.*) Citing the same medical findings, Dr. Corso opined that plaintiff could stand or walk for two to three hours during an eight-hour workday and without interruption for ten minutes. (*Id.*) Similarly, he indicated that plaintiff could sit for up to two hours and without interruption for ten to fifteen minutes. (*Id.* at 310.) Dr. Corso stated that plaintiff could never climb, stoop, crawl, or balance and could occasionally crouch or kneel. (*Id.*) He opined that plaintiff's reaching, handling, feeling, and pushing/pulling would cause exacerbation of his pain and spasm, as would exposure to heights, moving machinery, temperature extremes, and vibration. (*Id.* at 311.)

Dr. Pollack, meanwhile, diagnosed lower back pain with radiation and bilateral shoulder pain based on her October 22, 2012 examination. (*Id.* at 289.) She opined that plaintiff had a moderate restriction in bending, lifting, and carrying. (*Id.*) He also had mild restrictions in walking, standing, squatting, and pushing, pulling, and reaching with the right arm. (*Id.*) Dr. Pollack neither specified that the reaching restriction was limited to overhead reaching nor defined the parameters of a "mild" restriction. (*See id.*)

Dr. Billinghurst determined from his February 5, 2013 examination that there was no support for a more limited residual functional capacity than that established by the disability analyst on November 5, 2012 (*id.* at 302), *i.e.*, a residual functional capacity for sedentary work with limited capability to reach in all directions (*id.* at 293–98.)

Finally, on September 21, 2013, Dr. John Axline completed interrogatories at the ALJ's request based on a review of plaintiff's medical file, though he never examined plaintiff. (*Id.* at 322.) Dr. Axline noted the following impairments: shoulder injury, surgically corrected and rehabilitated with mild residual impairment; degenerative disc disease, lumbar, mild, without neurological loss; left shoulder impairments alleged with full range of motion and retained function; and elevated blood glucose without diagnosis, confirmation, or treatment. (*Id.*) He then indicated that none of these impairments equaled the criteria of an impairment listed in Appendix 1 of 20 C.F.R. § 404.1520. (*Id.* at 323.)

On the same day, Dr. Axline also completed a medical assessment of ability to do work-related activities based on his review of plaintiff's medical file. (*Id.* at 325.) Citing

6

mild lumbar disc degeneration on MRI images, Dr. Axline opined that plaintiff could lift or carry up to ten pounds frequently and up to twenty pounds occasionally, but never more than that. (*Id.*) He further opined that plaintiff could sit or walk for up to two hours without interruption and stand for up to one hour without interruption. (*Id.* at 326.) In total in an eight-hour workday, Dr. Axline indicated that plaintiff could sit for six hours, stand for two hours, and walk for four hours. (*Id.*) Citing the surgical repair of plaintiff's right shoulder, Dr. Axline stated that plaintiff could never reach overhead with his right hand but could continuously reach in all other directions and in any direction with his left hand. (*Id.* at 327.) Dr. Axline opined that plaintiff could continuously handle, finger, feel, and push or pull in an eight-hour workday and could frequently operate foot controls with both feet. (*Id.*) In Dr. Axline's view, plaintiff could occasionally climb stairs and ramps, stoop, kneel, crouch and crawl. (*Id.* at 328.) He could never climb ladders or scaffolds, but could continuously balance. (*Id.*) Dr. Axline opined that plaintiff could tolerate exposure to unprotected heights, moving mechanical parts, humidity and wetness, and vibrations frequently. (*Id.* at 329.) He could occasionally operate a motor vehicle or tolerate extreme heat or cold occasionally, but could never tolerate dust, odors, fumes, and pulmonary irritants. (*Id.*) Finally, Dr. Axline opined that plaintiff could perform activities like shopping, travel without a companion for assistance, ambulate without a wheelchair, walker, or cane, walk a block at a reasonable pace on rough or uneven surfaces, use public transportation, climb a few steps at a reasonable pace, prepare simple meals and feed himself, care for his personal hygiene, and sort, handle, or use paper and files. (*Id.* at 330.)

4. Vocational Evidence

Andrew Pasternack, a vocational expert, testified at a hearing on plaintiff's application for disability benefits. (*Id.* at 54–62.) He stated that plaintiff's past work as a police officer was a light skilled job. (*Id.* at 55.) When asked if there were jobs in the national economy that could be performed by a hypothetical individual of plaintiff's age, education, and past work experience, who could lift and carry up to twenty pounds occasionally and ten pounds frequently, sit up to six hours a day, stand and walk up to two hours a day, not reach overhead with his right upper dominant extremity, and not use ladders or scaffolds (*id.* at 55–56), Pasternack stated that such a person could not perform work as a police officer (*id.* at 57). Nevertheless, after noting that transferability of skills is not an issue for someone under the age of fifty like plaintiff, Pasternack stated that the hypothetical individual could perform work as a limousine driver, hand packager, or a ticket taker. (*Id.* at 58–60.) He also testified that there were 224,600 jobs as a limousine driver in the national economy, 318,000 jobs as a hand packager, and 100,000 jobs as a ticket taker. (*Id.* at 58–60.) Pasternack also said the hypothetical individual could perform work as a hotel desk clerk—a position with 224,000 jobs in the national economy—but retracted that job when he recognized that a hotel desk clerk would have to stand for more than two hours. (*Id.* at 58–59.)

B. Procedural History

Plaintiff filed an application for Social Security Disability benefits on June 26, 2012, claiming disability beginning on October 31, 2010. (*Id.* at 191.) The claim was denied initially (*id.* at 111–12, 116–23), and plaintiff requested a hearing before an ALJ (*see id.* at 124–31). Plaintiff appeared with counsel before ALJ Ronald R. Waldman on September 11, 2013 (*id.* at 65–110), where he testified

7

and revised his onset date to correspond with the onset of his lower back pain on February 27, 2012 (*id.* at 106–08). The ALJ held a supplemental hearing on January 7, 2014 to take testimony from the vocational expert and to permit cross examination of Dr. Axline. (*Id.* at 26–64.) The ALJ issued an unfavorable decision denying the claim on March 17, 2014. (*Id.* at 9–25.) The Appeals Council denied plaintiff's request for review of the ALJ's decision on August 6, 2015, making the ALJ's March 17 decision the final decision of the Commissioner. (*Id.* at 1–6.)

Plaintiff filed this action seeking reversal of the ALJ's decision on October 6, 2015. (ECF No. 1.) The Court received the administrative transcripts on March 24, 2016. (ECF No. 8.) Plaintiff filed a motion for judgment on the pleadings on June 7, 2016, and the Commissioner filed a cross-motion for judgment on the pleadings on August 5, 2016. (ECF Nos. 11, 15.) Plaintiff replied on August 30, 2016, and the Commissioner replied on September 22, 2016. (ECF Nos. 19, 21.) The Court has fully considered the parties' submissions.

II. STANDARD OF REVIEW

A district court may set aside a determination by an ALJ "only if it is based upon legal error or if the factual findings are not supported by substantial evidence in the record as a whole." *Greek v. Colvin*, 802 F.3d 370, 374–75 (2d Cir. 2015) (citing *Burgess v. Astrue*, 537 F.3d 117, 127 (2d Cir. 2008); 42 U.S.C. § 405(g)). The Supreme Court has defined "substantial evidence" in Social Security cases to mean "more than a mere scintilla" and that which "a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (internal citation omitted); *see Selian v. Astrue*, 708 F.3d 409, 417 (2d Cir. 2013). Furthermore, "it is up to the agency, and not [the] court, to weigh the conflicting evidence in the record." *Clark v. Comm'r of Soc. Sec.*, 143 F.3d 115, 118 (2d Cir. 1998). If the court finds that there is substantial evidence to support the Commissioner's determination, the decision must be upheld, "even if [the court] might justifiably have reached a different result upon a *de novo* review." *Jones v. Sullivan*, 949 F.2d 57, 59 (2d Cir. 1991) (citation omitted); *see also Yancey v. Apfel*, 145 F.3d 106, 111 (2d Cir. 1998) ("Where an administrative decision rests on adequate findings sustained by evidence having rational probative force, the court should not substitute its judgment for that of the Commissioner.").

III. DISCUSSION

A. The Disability Determination

A claimant is entitled to disability benefits if the claimant is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period not less than twelve months." 42 U.S.C. § 1382c(a)(3)(A). An individual's physical or mental impairment is not disabling under the SSA unless it is "of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." *Id.* § 1382c(a)(3)(B).

The Commissioner has promulgated regulations establishing a five-step procedure for evaluating disability claims. *See* 20 C.F.R. §§ 404.1520, 416.920. The Second Circuit has summarized this procedure as follows:

> The first step of this process requires the [Commissioner] to determine whether the claimant is presently em-

ployed. If the claimant is not employed, the [Commissioner] then determines whether the claimant has a "severe impairment" that limits her capacity to work. If the claimant has such an impairment, the [Commissioner] next considers whether the claimant has an impairment that is listed in Appendix 1 of the regulations. When the claimant has such an impairment, the [Commissioner] will find the claimant disabled. However, if the claimant does not have a listed impairment, the [Commissioner] must determine, under the fourth step, whether the claimant possesses the residual functional capacity to perform her past relevant work. Finally, if the claimant is unable to perform her past relevant work, the [Commissioner] determines whether the claimant is capable of performing any other work.

*Brown v. Apfel*, 174 F.3d 59, 62 (2d Cir. 1999) (quoting *Perez v. Chater*, 77 F.3d 41, 46 (2d Cir. 1996)). The claimant bears the burden of proof with respect to the first four steps, but the Commissioner bears the burden of proving the last step. *Id.*

The Commissioner "must consider" the following in determining a claimant's entitlements to benefits: "(1) the objective medical facts; (2) diagnoses or medical opinions based on such facts; (3) subjective evidence of pain or disability testified to by the claimant or others; and (4) the claimant's educational background, age, and work experience." *Id.* (quoting *Mongeur v. Heckler*, 722 F.2d 1033, 1037 (2d Cir. 1983) (per curiam)).

## B. The ALJ's Ruling

The ALJ here determined that plaintiff met the insured status requirements of the Social Security Act through December 31, 2015, had not engaged in substantial gainful activity since his onset date, and suffered from "severe impairments," including degenerative disc disease of the lumbar spine and status post arthroscopic surgery of the right shoulder. (AR at 14.) These impairments did not, however, fall under the list of impairments outlined in Appendix 1 of the regulations. (*Id.*) He also found that plaintiff could not perform his past work. (AR at 20.)

At the fourth step, the ALJ concluded that plaintiff had

> the residual functional capacity to perform light work as defined in 20 CFR 404.1567(a) except he can sit for six hours, stand/walk for two hours, lift/carry up to twenty pounds occasionally and lift/carry ten pounds frequently in an eight-hour workday. He cannot reach overhead with the right upper extremity or climb ladders and scaffolds.

(*Id.* at 15.) In support of this conclusion, the ALJ found that, although plaintiff's "medically determinable impairments could reasonably be expected to cause the alleged symptoms," his "statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible." (*Id.* at 16.) He found that the "medical evidence [did] not demonstrate significantly abnormal clinical findings and laboratory studies supporting the claimant's allegations of total disability." (*Id.*) Specifically, in plaintiff's shoulders, the ALJ noted that Dr. Corso "reported tenderness in the right shoulder with mildly decreased rotator cuff strength and positive impingement signs," but "there was no tenderness in the left shoulder and 5/5 strength in the remaining muscle groups of the right shoulder as well as the left upper extremity." (*Id.*) Furthermore, "[r]ange of motion of the shoulders was full without pain or crepitus and there [were] no masses, gross

9

deformities, muscle atrophy or instability." (*Id.*) In plaintiff's lumbar spine, the ALJ noted Dr. Corso's findings of "tenderness, spasm and limited range of motion . . . due to pain and stiffness, tenderness in the left gluteal region and positive straight leg raising on the left," but he also reported that "there were no motor strength deficits in the lower extremities and there were no reflex or sensory deficits in the upper or lower extremities." (*Id.*) Meanwhile, "[d]iagnostic studies showed bulging and herniated discs in the lumbar spine but there was no evidence of stenosis or cord involvement." (*Id.*)

After summarizing the examination results and opinions of Drs. Corso, Pollack, and Axline, the ALJ "accorded great weight" to Dr. Axline's opinion "because [Dr. Axline] reviewed the entire medical record and heard [plaintiff's] testimony at the supplemental hearing." (*Id.* at 19.) The ALJ gave "more weight" to this "contemporaneous opinion" than Dr. Corso's June 6, 2012 opinion, which "was written approximately 19 months prior to the hearing and only four months after the amended alleged onset date." (*Id.*) Dr. Corso also did not specify "what period [his opinion] applie[d] to or whether there was any expectation that the limitations would exist prospectively." (*Id.*) Furthermore, some of the doctor's examination notes contained inconsistencies, such as his reports of both a positive and a negative straight leg raising test on the same leg on the same day. (*Id.*) Finally, the ALJ noted that plaintiff's "activities of daily living," such as his cooking, barbequing, food shopping, and traveling, were "more consistent with Dr. Axline's opinion than Dr. Corso's opinion." (*Id.*) For these reasons, he credited Dr. Axline's opinion over Dr. Corso's, though he did not specify how much weight he accorded Dr. Corso's opinion. (*Id.*)

As for Dr. Pollack's opinion, the ALJ accorded it "[s]ome weight" because it was based on a complete physical examination and was consistent with Dr. Axline's opinion. (*Id.* at 20.)

Summarizing his conclusions regarding plaintiff's residual functional capacity, the ALJ stated that plaintiff "has some pain from degenerative disc disease of the lumbar spine and injury and arthroscopic surgery of his right shoulder that results in some functional limitations but they are no[t] so severe as to preclude performance of all substantial gainful activity." (*Id.*) In particular, plaintiff "retain[ed] the residual functional capacity to perform light work" because he could "sit for up to six hours, stand/walk up to two hours and lift/carry up to twenty pounds occasionally and up to ten pounds occasionally in an eight-hour work day," though the ALJ also noted that plaintiff could not "lift overhead with the right dominant arm or climb ladders or scaffolds." (*Id.*) The ALJ asserted that the assessments from both Dr. Corso and Dr. Axline supported this finding, as did plaintiff's daily activities and his acknowledgment that "physically he would be able to work at a light duty job with his right shoulder problem." (*Id.*)

Having concluded that plaintiff retained the residual functional capacity to perform some light work, the ALJ found that plaintiff qualified as a "younger individual," as he was 44 on the alleged onset date, and had attained a high school education. (*Id.*) The ALJ then concluded that, based on plaintiff's "age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that [plaintiff] can perform." (*Id.* at 21.) Specifically, the ALJ relied on Pasternack's testimony to conclude that plaintiff could perform work as a limousine driver, hotel desk clerk, hand packer, or ticket taker. (*Id.* at 21–22.) Consequently, the ALJ determined that plaintiff did not qualify for disability benefits. (*Id.* at 22)

C. Analysis

Plaintiff challenges the ALJ's conclusions that he has the residual functional capacity to perform some light work and that jobs exist in the national economy that plaintiff can perform.[1] Specifically, plaintiff asserts that (1) substantial evidence does not support the ALJ's finding that plaintiff can perform unrestricted reaching with his right arm other than overhead reaching and (2) the jobs the ALJ claimed plaintiff could perform are inappropriate given plaintiff's limitations. (Pl.'s Mem. of Law in Support of Pl.'s Mot. for Judgment on the Pleadings ("Pl.'s Br."), ECF No. 12, at 17, 21). He also argues that Dr. Corso's opinion was entitled to great weight and Dr. Axline's was entitled to no weight. (Pl.'s Reply Mem. of Law ("Pl.'s Reply"), ECF No. 19, at 1, 3.)

As set forth below, the Court concludes that the ALJ erred by failing to provide "good reasons" for crediting Dr. Axline's opinion over Dr. Corso's and by failing to indicate how much weight he accorded Dr. Corso's opinion. These errors warrant remand.

1. Opinion of the Treating Physician

Plaintiff argues that the treating physician's opinion was entitled to great weight. (Pl.'s Reply at 1–3.) The Commissioner responds that the ALJ correctly evaluated Dr. Corso's opinion before choosing to reject it. (Def.'s Reply Mem. of Law ("Def.'s Reply"), ECF No. 21, at 1–3.) For the following reasons, the Court concludes that a remand on this issue is warranted.

The Commissioner must give special evidentiary weight to the opinion of a treating physician. *See Clark*, 143 F.3d at 118. The "treating physician rule," as it is known, "mandates that the medical opinion of a claimant's treating physician [be] given controlling weight if it is well supported by medical findings and not inconsistent with other substantial record evidence." *Shaw v. Chater*, 221 F.3d 126, 134 (2d Cir. 2000); *see also, e.g.*, *Rosa v. Callahan*, 168 F.3d 72, 78–79 (2d Cir. 1999); *Clark*, 143 F.3d at 118; 20 C.F.R. § 404.1527(c)(2).

Nevertheless, "[g]enerally, 'the opinion of the treating physician is not afforded controlling weight where . . . the treating physician issued opinions that are not consistent with . . . the opinions of other medical experts,' for '[g]enuine conflicts in the medical evidence are for the Commissioner to resolve.'" *Burgess*, 537 F.3d at 128 (quoting *Halloran v. Barnhart*, 362 F.3d 28, 32 (2d Cir. 2004), and *Veino v. Barnhart,* 312 F.3d 578, 588 (2d Cir. 2002), respectively) (omissions and second alteration in original). As the Second Circuit has stated, however, "not all expert opinions rise to the level of evidence that is sufficiently substantial to undermine the opinion of the treating physician." *Id.* Indeed, the opinions of consultative and non-examining physicians are entitled to comparatively little weight. *See Vargas v. Sullivan*, 898 F.2d 293, 295–96 (2d Cir. 1990) ("The general rule is that 'the written reports of medical advisors who have not personally examined the claimant deserve little weight in the overall evaluation of disability. The advisers' assessment of what other doctors find is hardly a basis for competent evaluation without a personal examination of the claimant.'" (quoting *Allison v. Heckler*, 711 F.2d 145, 147–48 (10th Cir. 1983))); *Filocomo v. Chater*, 944 F. Supp. 165, 170 n.4 (E.D.N.Y. 1996) ("[T]he conclusions of a physician who merely reviews a medical file and performs no examination are entitled to

---

[1] The Court concludes that substantial evidence supports the ALJ's determinations with respect to the other steps.

11

little if any weight."); *see also Selian*, 708 F.3d at 419 ("ALJs should not rely heavily on the findings of consultative physicians after a single examination."); *Santiago v. Barnhart*, 441 F. Supp. 2d 620, 627 (S.D.N.Y. 2006) (holding that ALJ erred in giving consulting physicians' opinions controlling weight over those of the treating physicians); *but see Micheli v. Astrue*, 501 F. App'x 26, 29 (2d Cir. 2012) ("[T]he applicable regulations 'permit the opinions of nonexamining sources to override treating sources' opinions provided they are supported by evidence in the record." (quoting *Diaz v. Shalala*, 59 F.3d 307, 313 n.5 (2d Cir. 1995))).

Correspondingly, when an ALJ decides that the opinion of a treating physician should not be given controlling weight, the ALJ must "give good reasons in [the] notice of determination or decision for the weight [she] gives [the claimant's] treating source's opinion." 20 C.F.R. § 404.1527(c)(2); *see Burgess*, 537 F.3d at 129; *Perez v. Astrue*, No. 07–CV–958 (DLJ), 2009 WL 2496585, at *8 (E.D.N.Y. Aug. 14, 2009). Specifically, "[a]n ALJ who refuses to accord controlling weight to the medical opinion of a treating physician must consider certain 'factors' to determine how much weight to give the opinion." *Halloran*, 362 F.3d at 32 (citing 20 C.F.R. § 404.1527(d)(2)). Those factors include: "(i) the frequency of examination and the length, nature and extent of the treatment relationship; (ii) the evidence in support of the treating physician's opinion; (iii) the consistency of the opinion with the record as a whole; (iv) whether the opinion is from a specialist; and (v) other factors brought to the [ALJ's] attention that tend to support or contradict the opinion." *Id.* (citing 20 C.F.R. § 404.1527(d)(2)). If an ALJ fails "to provide 'good reasons' for not crediting the opinion of a claimant's treating physician," remand is appropriate. *Snell v. Apfel*, 177 F.3d 128, 133 (2d Cir. 1999); *Burgess*, 537 F.3d at 129–30. Relatedly, an ALJ has an "affirmative duty to develop the administrative record" and, consequently, "cannot reject a treating physician's diagnosis without first attempting to fill any clear gaps in the administrative record." *Burgess*, 537 F.3d at 129.

Here, on June 6, 2012, treating physician Dr. Corso opined that, in an eight-hour work day, plaintiff could lift up to ten pounds occasionally, stand or walk for two to three hours and without interruption for ten minutes, sit for up to two hours and for ten to fifteen minutes without interruption, never climb, stoop, crawl or balance, and occasionally crouch or kneel. (AR at 309.) Dr. Corso also stated that plaintiff's reaching, handling, feeling, and pushing or pulling would cause exacerbation of his pain and spasm. (*Id.* at 311.) By contrast, Dr. Axline, a non-examining physician who reviewed plaintiff's medical file and heard his testimony, opined that, in an eight-hour workday, plaintiff could lift up to ten pounds frequently and twenty pounds occasionally, stand for two hours total and up to an hour without interruption, walk for four hours total and up to two hours without interruption, and sit for six hours total and up to two hours without interruption. (*Id.* at 326.) He also stated that plaintiff could reach in all directions with his right hand except overhead and could occasionally climb stairs and ramps, stoop, kneel, crouch and crawl. (*Id.* at 326–27.)

The ALJ gave "more weight" to Dr. Axline's opinion, providing the following reasons: (1) Dr. Corso's opinion was nineteen months old at the time of the hearing and did not indicate whether there was any expectation that plaintiff's limitations would continue prospectively, while Dr. Axline's was contemporaneous; (2) Dr. Corso's treatment notes contained some demonstrable errors; and (3) plaintiff's testimony about his daily activities and ability to work with his shoulder injury were consistent with Dr. Axline's

opinion but not Dr. Corso's.[2] (*Id.* at 19–20.) The ALJ did not, however, specify precisely how much weight he accorded Dr. Corso's opinion. (*See id.*)

The ALJ violated the treating physician rule in two ways. First, he did not provide "good reasons" for refusing to give Dr. Corso's opinion controlling weight. The first two reasons the ALJ provided for rejecting Dr. Corso's opinion—the timing and vagueness of that opinion and the errors in Dr. Corso's notes—do not constitute valid grounds for rejecting it. Instead, the ALJ has merely identified "clear gaps in the administrative record" that he had an obligation to "attempt[] to fill." *Burgess*, 537 F.3d at 129; *see also Selian*, 708 F.3d at 420 ("[T]o the extent that record is unclear, the Commissioner has an affirmative duty to fill any clear gaps in the administrative record before rejecting a treating physician's diagnosis."). In *Rosa*, for example, the treating physician only supplied a single-page, "wholly conclusory" assessment of the plaintiff's condition to account for several years' worth of medical history. 168 F.3d at 79–80. The Second Circuit held that, "[c]onfronted with this situation, the ALJ should have taken steps directing Rosa to ask Dr. Ergas to supplement his findings with additional information. It is entirely possible that Dr. Ergas, if asked, could have provided a sufficient explanation for any seeming lack of support for his ultimate diagnosis of complete disability." *Id.* at 80 (brackets omitted).

The same is true here. If the ALJ had asked Dr. Corso whether he still held the same opinion regarding plaintiff's ability to do work at the time of the hearing or if the limitations in his earlier opinion applied prospectively, the doctor could have clarified his position. Likewise, Dr. Corso could have explained the errors in his notes if the ALJ had asked him about the seeming contradiction over whether plaintiff passed or failed his straight leg raising test. Under these circumstances, "the ALJ should have taken steps directing [plaintiff] to ask Dr. [Corso] to supplement his findings with additional information," rather than merely citing those gaps in the record as reasons for rejecting the treating physician's opinion outright. *Id.*; *see also Schaal v. Apfel*, 134 F.3d 496, 505 (2d Cir. 1998) ("The lack of clinical findings complained of by the ALJ did not justify the failure to assign at least some weight to Dr. Jobson's opinion. . . . [E]ven if the clinical findings were inadequate, it was the ALJ's duty to seek additional information from Dr. Jobson *sua sponte*."); *Clark*, 143 F.3d at 118 ("If asked, Dr. Sookhu might have been able to provide a medical explanation for why Clark's condition deteriorated over time.").

The final reason the ALJ gave for discrediting Dr. Corso's opinion—plaintiff's testimony regarding his daily activities—alone does not justify his departure from the treating physician rule. Although courts have cited inconsistencies between a plaintiff's daily living and a treating physician's opinion as grounds for rejecting that decision, such inconsistencies should not be sufficient, by themselves, to discredit a treating physician's opinion, but must be considered in light of the complete record. *See, e.g.*, *Rivera*

---

[2] Dr. Axline's opinion "cannot by itself constitute substantial evidence that justifies the rejection of the opinion of . . . a treating physician" because Dr. Axline was a "nonexamining physician." *Lester v. Chater*, 81 F.3d 821, 831 (9th Cir. 1995); *see also Radford v. Colvin*, 734 F.3d 288, 295 (4th Cir. 2013) ("[R]eliance on the opinion of nonexamining physicians cannot, by itself, constitute substantial evidence." (citing *Lester*, 81 F.3d at 831)); *Gudgel v. Barnhart*, 345 F.3d 467, 470 (7th Cir. 2003) ("An ALJ can reject an examining physician's opinion only for reasons supported by substantial evidence in the record; a contradictory opinion of a non-examining physician does not, by itself, suffice.").

13

*v. Colvin*, No. 15 CIV. 3857(AJP), 2015 WL 9591539, at *15 (S.D.N.Y. Dec. 18, 2015) (citing several other factors on which ALJ relied in properly rejecting treating physician's opinion); *Blessing v. Colvin*, No. 3:14-CV-1489 (GTS), 2015 WL 7313401, at *10 (N.D.N.Y. Nov. 19, 2015) (same); *Steller v. Comm'r of Soc. Sec.*, No. 2:10-CV-160, 2011 WL 926874, at *5 (D. Vt. Mar. 15, 2011) (same); *Bennett v. Astrue*, No. 07-CV-0780 NAM, 2010 WL 3909530, at *5–6 (N.D.N.Y. Sept. 30, 2010) (same); *Coyle v. Apfel*, 66 F. Supp. 2d 368, 378 (N.D.N.Y. 1999) (same); *Carey v. Apfel*, 6 F. Supp. 2d 195, 201 (W.D.N.Y. 1998) (same); *see also Indelicato v. Colvin*, No. 13–CV–4553, 2014 WL 674395, at *3–5 (E.D.N.Y. Feb. 21, 2014) ("[T]he ability to perform many specific daily activities does not itself mean that [the plaintiff] is not disabled. But *taken together*, these activities give texture both to medical diagnosis and subjective accounts, and they provide an important objective basis by which to evaluate a person's symptoms." (emphasis added)).

On the contrary, in *Brown v. Barnhart*, 418 F. Supp. 2d 252, 262 (W.D.N.Y. 2005), the court held that perceived inconsistencies between a treating physician's opinion and a plaintiff's testimony regarding her daily life were *insufficient* for the ALJ to disregard the opinion. Specifically, the court there held that "the ALJ improperly substituted his own opinion for the opinions . . . of plaintiff's treating physicians" where "[t]he ALJ found [the] plaintiff not disabled, based primarily on her activities of daily living, such as the fact that she listened to music, sat in the sun, stayed up late at night, visited with friends, and accompanied a relative on fishing trips" and did "not cite any *medical evidence* that these activities and comments are inconsistent with plaintiff's claimed disability." *Id.* (emphasis added); *see also Nutkins v. Shalala*, No. 92-CV-40, 1994 WL 714252, at *8 (N.D.N.Y. Dec. 22, 1994) ("[D]aily activities clearly are not 'medical evidence' which can contradict a treating physician's opinion."). Thus, absent additional reasons for rejecting the treating physician's opinions, the court concluded the ALJ erred in doing so. *Brown*, 418 F. Supp at 262.

Likewise, in this case, given the inadequacies of the ALJ's other explanations with respect to the medical evidence, the ALJ could not rely solely on plaintiff's daily activities to justify crediting Dr. Axline over Dr. Corso.[3] *See id.* This final justification for rejecting the treating physician's opinion, therefore, does not by itself amount to a "good reason" for doing so, especially because additional review of the medical evidence on remand might alter the ALJ's views regarding the plaintiff's testimony. Overall, therefore, the ALJ failed to provide "good reasons" for crediting Dr. Axline's opinion over Dr. Corso's. *See Burgess*, 537 F.3d at 132; *Halloran*, 362 F.3d at 32; *Santiago*, 441 F. Supp. 2d at 627; *see also* 20 C.F.R. § 404.1527(c)(2).

In any event, even assuming the ALJ did provide "good reasons" for according Dr. Corso's opinion less weight than Dr. Axline's, he still erred "by failing to properly determine *how much* weight to accord [Dr. Corso's] opinion." *Gorel v. Astrue*, No. 10-CV-5660 NGG, 2012 WL 3250048, at *10 (E.D.N.Y. Aug. 7, 2012); *see also Foxman v. Barnhart*, 157 F. App'x 344, 346 (2d Cir.

---

[3] In addition, much of plaintiff's testimony concerning his daily life was consistent with Dr. Corso's opinion. (*See, e.g.*, AR at 93 (plaintiff testifying that he could never lift more than ten pounds); *id.* at 99 (plaintiff testifying that he only went to about five local sports games per year due to difficulty sitting); *id.* at 102, 109 (plaintiff testifying that his wife completed most chores, including mowing the lawn and snow-blowing).)

2005) ("An ALJ is entitled to give greater weight to the opinion of a non-treating physician—and even to disregard the opinion of a treating physician altogether—but only if the ALJ's decision is based upon proper consideration of the [20 C.F.R. § 404.1527] factors."). In *Gorel*, the court concluded that an ALJ committed this error when "she ignored important evidence in support of [the treating physician's] opinion" and "appear[ed] to have accorded it [no weight] at all." *Id.* Similarly, the ALJ here simply stated that "Dr. Axline is given more weight than Dr. Corso[]" without specifying how much weight he gave Dr. Corso's opinion, instead seeming to give it no weight whatsoever. (AR at 19–20.) As in *Gorel*, moreover, there was "important evidence in support of [Dr. Corso's] opinion." 2012 WL 3250048, at *10. Specifically, Dr. Corso, an orthopedic specialist, frequently treated plaintiff for shoulder and back pain from May 2008 through July 2013 (*see* AR at 250–86, 313–21), and at least some of the medical evidence supports his conclusion regarding plaintiff's capacity to sit, stand, walk, and reach. *See Halloran*, 362 F.3d at 32 (ALJ must consider "the frequency of examination and the length, nature and extent of the treatment relationship; . . . the evidence in support of the treating physician's opinion; . . . [and] whether the opinion is from a specialist" (citing 20 C.F.R. § 404.1527(d)(2))). For example, Dr. Corso consistently noted that plaintiff's apprehension, Neer, and Hawkins tests were positive (*id.* at 258, 261, 265, 285) and that plaintiff experienced pain with resistance to shoulder motion as well as tenderness over the right A-C joint and proximal humerus (*id.* at 258, 261, 265). An MRI of plaintiff's back, meanwhile, revealed diffuse degenerative disc disease with multilevel bulging and facet arthropathy and central herniation L4-L5. (*Id.* at 256.) Dr. Corso also diagnosed an anterior labral tear in the right shoulder (*id.* at 271, 281), performed surgery on that shoulder to treat the tear (*id.* at 273), and prescribed pain medication for both shoulder and back pain (*id.* at 266, 267, 269).

This evidence provided at least some support for Dr. Corso's opinion, but the ALJ does not even discuss it when weighing the physicians' opinions.[4] Under *Gorel*, therefore, by failing to specify how much weight he accorded that opinion—and seemingly according it none at all in the face of supporting evidence—the ALJ violated the clear command of the regulations "that a treating physician's opinion should not be completely rejected if that opinion is found to be non-controlling." *Ellington v. Astrue*, 641 F. Supp. 2d 322, 330 (S.D.N.Y. 2009) (citing 20 C.F.R. § 404.1527(d)(2)); *see also Gorel*, 2012 WL 3250048, at *10; *Hach v. Astrue*, No. 07-CV-2517 (ENV), 2010 WL 1169926, at *11 (E.D.N.Y. Mar. 23, 2010).

In short, the ALJ failed to provide "good reasons" for lending less than controlling weight to Dr. Corso's opinion. *Snell*, 177 F.3d at 133. That failure "by itself warrants remand." *Selian*, 708 F.3d at 419. Moreover, even if the ALJ had provided good reasons for not giving Dr. Corso's opinion "controlling weight," it was still entitled to some

---

[4] Although some of Dr. Corso's examination notes seem to cut against his June 6, 2012 opinion (*see, e.g.*, *id.* at 261, 271 (noting no muscle atrophy, instability, or tenderness in the right shoulder)), the ALJ did not cite that evidence as a reason for rejecting Dr. Corso's opinion, nor did he simply discount Dr. Corso's opinion in light of that evidence (*id.* at 20). Furthermore, the ALJ discussed the medical findings only when summarizing those findings and evaluating plaintiff's subjective complaints of pain. (*Id.* at 16–19.) The medical findings played no explicit role in his evaluation of the competing opinions. (*See id.* at 19–20 (citing age of opinion, errors in notes, and plaintiff's daily activities as the only reasons for giving Dr. Axline's opinion more weight).)

15

weight, *see Ellington*, 641 F. Supp. 2d at 330, so the ALJ erred by failing to specify how much weight he gave it, *see Gorel*, 2012 WL 3250048, at *10; *Hach*, 2010 WL 1169926, at *11. On remand, the ALJ is instructed to fully consider the 20 C.F.R. § 404.1527 factors, specify the amount of weight given to Dr. Corso's opinion, and, should he choose to give that opinion less than controlling weight, provide "good reasons" for doing so in light of the factors.

2. Remaining Arguments

Plaintiff also asserts that there was not substantial evidence to support the ALJ's finding that plaintiff can perform unrestricted reaching with his right arm other than overhead reaching. (Pl.'s Br. at 18–20; Pl.'s Reply at 4.) This argument largely amounts to a claim that the ALJ erred in crediting Dr. Axline's testimony over Dr. Corso's, as that finding was the basis for the ALJ's conclusion that plaintiff could reach in any direction except overhead. (*See* Pl.'s Br. at 18–20; Pl.'s Reply at 4.) In addition, plaintiff argues that there was not substantial evidence to support the finding that he could perform work as a limousine driver, hotel desk clerk, hand packer, and ticket taker. (Pl.'s Br. at 21.) This finding was also based on the ALJ's decision to accord Dr. Axline's opinion greater weight than Dr. Corso's. (*See* AR at 21.)

In light of this Court's ruling that the ALJ committed legal error by failing to give "good reasons" for rejecting Dr. Corso's opinion and failing to specify how much weight he gave that opinion, the Court need not and does not address these issues. If, however, the ALJ decides on remand to accord more weight to Dr. Axline's opinion than Dr. Corso's, in addition to setting forth "good reasons" for doing so and specifying the weight accorded to Dr. Corso's opinion, the ALJ is also directed to state with particularity the evidence in the record that supports Dr. Axline's opinion. *See Micheli*, 501 F. App'x at 29; *Netter v. Astrue*, 272 F. App'x 54, 55–56 (2d Cir. 2008) ("Under the applicable regulations, even 'nonexamining sources' may 'override treating sources' opinions, provided they are supported by evidence in the record.'" (quoting *Schisler v. Sullivan,* 3 F.3d 563, 568 (2d Cir. 1993))); *Scott v. Colvin*, No. 14-CV-7331 (RRM), 2016 WL 5173252, at *15 (E.D.N.Y. Sept. 21, 2016) (similar); *Rosario v. Comm'r of Soc. Sec.*, No. 14-CV-1605 (DLI), 2016 WL 1258476, at *14 (E.D.N.Y. Mar. 30, 2016) (similar); *Oliphant v. Astrue*, No. 11-CV-2431, 2012 WL 3541820, at *15 (E.D.N.Y. Aug. 14, 2012) (similar).

IV. CONCLUSION

For the reasons set forth above, the Commissioner's motion for judgment on the pleadings is denied. Plaintiff's motion for judgment on the pleadings is denied. The case is remanded to the ALJ for further proceedings consistent with this Memorandum and Order.

SO ORDERED.

_____
JOSEPH F. BIANCO
United States District Judge

Dated: February 28, 2016
      Central Islip, NY

\* \* \*

Plaintiff is represented by Christopher J. Bowes, 54 Cobblestone Drive, Shoreham, New York 11786. The Commissioner is represented by Candace S. Appleton, Assistant U.S. Attorney, on behalf of Robert L. Capers, United States Attorney, Eastern District of New York, 271 Cadman Plaza East, 7th Floor, Brooklyn, New York, 11201.